799 P.2d 133

**McCONAL AVIATION, INC.,**
**Plaintiff–Appellee,**

v.

**COMMERCIAL AVIATION**
**INSURANCE COMPANY,**
**Defendant–Appellant.**

**No. 18466.**

Supreme Court of New Mexico.

Oct. 10, 1990.

698

Carpenter, Crout & Olmsted, Rebecca Dempsey, Santa Fe, McClure & Eyler, Richard R. Eyler, Ann C. Rice, Denver, Colo., for defendant-appellant.

Hinkle, Cox, Eaton, Coffield & Hensley, Nancy S. Cusack, Albert L. Pitts, Roswell, for plaintiff-appellee.

## OPINION

WILSON, Justice.

Defendant Commercial Aviation Insurance Company, Inc. (Commercial) appeals a trial court judgment awarding Plaintiff McConal Aviation, Inc. (McConal) $65,000 in damages plus interest and costs, without credit for amounts paid by another settling defendant. We affirm the trial court.

## FACTS

In October 1984 Falcon Insurance Agency (Falcon) and McConal agreed that Falcon would obtain property insurance for an aircraft owned by McConal. McConal executed an installment contract to pay for the insurance and Falcon indicated that the policy was effective beginning October 12, 1984. Falcon then contacted Aviation General Insurance Company, Inc. (Aviation), an insurance broker, to obtain an insurance binder for McConal's policy. At Aviation's request Commercial issued a binder for a thirty-day period, ending November 12, 1984. Commercial then sent Aviation a letter requesting that McConal fill out an application for insurance and return it before the binder expired. Although Aviation apparently received a timely completed application and subsequently forwarded it to Commercial, Commercial did not receive it until November 25, 1984, thirteen days after the binder expired.

McConal was unaware that its aircraft was insured for only one month. On November 21, 1984 the aircraft was involved in a crash and sustained $47,369.30 in damages. When McConal requested monies to repair the aircraft, Falcon disclosed that the insurance was not in effect at the time of the crash and refused to pay.

On August 26, 1985 McConal sued Falcon, Aviation, and Commercial alleging breach of contract, negligence, bad faith, and deceptive trade practices. Specifically, McConal alleged: (1) Falcon breached its contractual duty to procure property insurance for the aircraft; (2) Falcon was Commercial's agent and Commercial was thus liable as its principal; and (3) Aviation was negligent in failing to forward to Commercial the information necessary to continue McConal's policy. McConal sought compensatory damages, punitive damages, and treble damages pursuant to the Unfair Trade Practices Act, NMSA 1978, Section 57–12–1 et seq.

Falcon never appeared in the action. A week prior to trial, Aviation settled with McConal for $40,000 and trial was held solely against Commercial. The trial court granted Commercial's motion for a directed verdict as to the negligence count, and McConal withdrew the deceptive trade practices claim. Thus the only claim remaining for the jury was for breach of contract against Commercial.

Among the proposed jury instructions Commercial submitted was a modified version of SCRA 1986, 13–1825 (UJI 1825), which the court rejected on grounds that the jury was not entitled to be informed of a prior settlement. The jury was not told of the other original defendants and was

merely instructed as to McConal's damages. The jury returned a $65,000 verdict in McConal's favor.

After the verdict, Commercial argued that it should receive a $40,000 credit towards the judgment, representing the amount of Aviation's settlement with McConal. The trial court denied Commercial's motion for a credit for the settlement amount and entered judgment against Commercial for $65,000. Commercial appeals the trial court's judgment.

ISSUES

On appeal Commercial claims the trial court erred in: (1) refusing to submit Commercial's requested jury instruction based on UJI 1825, and (2) refusing to credit the amount of Aviation's settlement with McConal toward the judgment against Commercial. We address each issue in turn.

DISCUSSION

1. *Jury Instruction*

Commercial first claims the trial court erred by refusing to submit its modified version of the uniform jury instruction on contribution among tortfeasors.

▮ The directions for use of UJI 1825 state that "[t]his instruction is to be used *only* where a *joint tortfeasor* has been released in conformity with the Uniform Contribution Among Tortfeasors Act, 41–3–1, NMSA 1978 * * * *" (emphasis added). For purposes of the Contribution Among Tortfeasors Act, "the term 'joint tortfeasors' means two or more persons jointly or severally *liable in tort* for the same injury to person or property, whether or not judgment has been recovered against all or some of them." NMSA 1978, 41–3–1 (Repl.Pamp.1989) (emphasis added).

In this case Commercial successfully obtained a dismissal of the complaint of negligence and the matter went to the jury only on the breach of contract claim. Therefore, the jury was not deciding a tort claim but a contract claim. Also, there was never a determination of liability against Aviation, so there has been no finding that any defendant is a tortfeasor. Thus the trial court did not err; the instruction was properly refused.

2. *Credit of McConal's Settlement*

Commercial contends that the trial court committed reversible error by refusing to credit the amount paid in settlement by Aviation to the verdict entered against Commercial. Commercial asserts that the failure to credit the amount paid by Aviation results in an impermissible double recovery by McConal. The argument is based on the contention that "McConal sued several Defendants to redress the one wrong which it suffered. It was clearly seeking only one recovery arising from the one incident." We cannot agree.

▮ The jury found that a valid contract existed between McConal and Commercial and then found damages of $65,000 resulted from Commercial's breach of the contract. The claim against Aviation was for negligence in failing to forward the application. Had that claim also gone to the jury it might well have awarded McConal additional damages caused by Aviation's negligence. That would not have represented double recovery for the same wrong, and this fact is not changed by Aviation's decision to settle any claims against it.

McConal, on the other hand, asserts that the settlement with Aviation falls squarely within the confines of *Exum v. Ferguson*, 97 N.M. 122, 637 P.2d 553 (1981), and therefore should not be credited against the jury award against Commercial. We agree that *Exum* controls in this case.

▮ In *Exum* the plaintiff sued two defendants, one of whom settled with the plaintiff prior to trial. The case proceeded against the remaining defendant based on a breach of contract claim. The defendant requested that the amount of the settlement be credited against the jury award, based on the Uniform Contribution Among Tortfeasors Act. The trial court refused to credit the settlement amount against the damages awarded by the jury for breach of contract. This court upheld the trial court, pointing out that no tort claim had been made against the remaining defendant. We held that "[b]ecause Occidental's and

Ferguson's suits were based on different theories of liability, they are not joint tortfeasors and Ferguson is not entitled to a credit of Occidental's settlement." *Id.* at 125, 637 P.2d at 556. Likewise, this case was not tried under a tort theory. Therefore, Commercial and Aviation are not joint tortfeasors, and Commercial is not entitled to credit for the settlement paid by Aviation.

Commercial attempts to distinguish *Exum* by pointing out that in that case it was the insurer that had settled with the plaintiff on a breach of contract claim and the case proceeded to trial on tort claims against another defendant, whereas in this case an alleged tortfeasor settled with McConal and only the breach of contract suit against the insurer was tried. We find this distinction to be irrelevant. As in *Exum,* there are no joint tortfeasors involved in this case.

■ Commercial also argues that in New Mexico a plaintiff cannot recover more than his actual losses. While this is a correct statement of the general rule, an exception is the collateral source rule. The collateral source rule allows a plaintiff to recover his full losses from the responsible defendant, even though he may have recovered part of his losses from a collateral source.

> As a general rule, benefits received by the plaintiff from a source collateral to the tortfeasor or contract breacher may not be used to reduce the defendant's liability for damages. This rule holds even though the benefits are payable to the plaintiff because of the defendant's actionable conduct and even though the benefits are measured by the plaintiff's losses.

D. Dobbs, *Handbook on the Law of Remedies* § 3.6, at 185 (1973).

We find persuasive the case of *Rose v. Hakim,* 335 F.Supp. 1221 (D.D.C.1971) cited by McConal. The *Hakim* case involved a malpractice claim where the plaintiff settled with two of the medical practitioners for the sum of $270,000 and then took the defendant hospital to trial, recovering a jury verdict of $294,777.25, representing full compensation to the plaintiff. After the jury verdict the defendant hospital claimed the right to credit for the $270,000 paid by the settling defendants.

In rejecting the hospital's claim, the court noted that the settling defendants were found to be free of fault by the jury and that they were therefore not tortfeasors, as they had committed no tort. The amounts paid by the settling defendants were, "in the legal sense, voluntary. They were, in legal terminology, collateral sources." *Id.* at 1236. The court then quoted *Hudson v. Lazarus,* 217 F.2d 344, 346 (D.C.Cir.1954):

> "In general the law seeks to award compensation, and no more, for personal injuries negligently inflicted. Yet an injured person may usually recover in full from a wrongdoer regardless of anything he may get from a 'collateral source' unconnected with the wrongdoer. Usually the collateral contribution necessarily benefits either the injured person or the wrongdoer. Whether it is a gift or the product of a contract of employment or of insurance, the purposes of the parties to it are obviously better served and the interests of society are likely to be better served if the injured person is benefitted than if the wrongdoer is benefitted."

335 F.Supp. at 1236. We agree with the *Hudson* court that if a collateral resource is to benefit a party, it should better benefit the injured party than the wrongdoer.

There are also sound policy reasons for not permitting the offset. The policy of New Mexico is to favor amicable settlement of claims without litigation. *Ratzlaff v. Seven–Bar Flying Serv., Inc.,* 98 N.M. 159, 646 P.2d 586 (Ct.App.), *cert. denied,* 98 N.M. 336, 648 P.2d 794 (1982). We feel compelled to enforce the terms and expectations of the settling parties. *See D. D. Williamson & Co. v. Allied Chem. Corp.,* 569 S.W.2d 672 (Ky.1978). In *Williamson,* one defendant (Allied) argued that it was entitled to a credit against a jury award to the extent of a settlement paid by another defendant (PB & S). The plaintiff Williamson, like McConal, insisted that he should retain the benefit of his bargain and settle-

ment with PB & S and that Allied should not benefit from the settlement to which it was not a party. The *Williamson* court said:

> Williamson and PB & S reached an arms length negotiated settlement. PB & S bought its peace and Williamson sold its claim against PB & S for a price satisfactory to the settling parties. Allied and Williamson took their dispute to the jury. To now allow Allied to benefit from PB & S's generosity discourages the policy of encouraging and finalizing partial settlements * * * *.

> \* \* \* \* \* \*

We conclude in this case that the same policy militates in favor of allowing the plaintiff to enjoy a favorable settlement or being bound by a poor settlement.

569 S.W.2d at 674.

In agreeing to settle, McConal and Aviation both gambled that they were faring better than if they had gone to trial. Both remain bound to that settlement, even if subsequent events should prove them wrong. Yet if we were to allow Commercial the offset it seeks, the odds would be better for a defendant who refuses to settle and proceeds to trial; he might well have part of his liability borne by a party who had not been adjudged liable and might never have been even if he had gone to trial. In short, Commercial would reap the benefit of a settlement to which it was not a party.

## CONCLUSION

We conclude that the same policy which binds a plaintiff to a poor settlement permits him to enjoy a favorable settlement. There was no error in refusing to offset the judgment and therefore the trial court is affirmed.

IT IS SO ORDERED.

BACA, J., concurs.

MONTGOMERY, J., specially concurring.

MONTGOMERY, Justice (specially concurring).

I concur in the result. I agree that the trial court did not err by refusing to give the jury a modified UJI 1825 instruction. *Exum v. Ferguson* holds that UJI 1825 is not applicable where joint tortfeasors are not involved, 97 N.M. at 125, 637 P.2d at 556. This does not answer the question whether the jury should be instructed as to a settlement by a previous defendant when the case proceeds to determine the remaining defendant's breach of contract, but I would hold that the remaining defendant's entitlement to a credit for the other defendant's settlement is a question of law. The credit, if any, should be applied by the court, not the jury.

Is the remaining defendant entitled to a credit for the settlement previously made with another defendant? I do not believe that this question can be answered, as this Court answered it in *Exum*, by simply classifying the claim against the remaining defendant as a contract claim rather than a tort claim and the defendants as severally liable rather than liable as joint tortfeasors. The question should instead be answered by identifying and evaluating the relevant policies in favor of and opposed to each answer and deciding which policy or policies should be given primacy in this case.

The first policy is that against awarding a claimant compensation that exceeds his losses—the policy against duplicate recovery. This is a venerable policy in American law. *See, e.g., Hale v. Basin Motor Co.,* 110 N.M. 314, 795 P.2d 1006 (1990) (citing *Hood v. Fulkerson,* 102 N.M. 677, 680, 699 P.2d 608, 611 (1985)); W. Keeton, D. Dobbs, R. Keeton & D. Owens, *Prosser and Keeton on the Law of Torts* § 48, at 330 (5th ed.1984) [hereinafter Prosser & Keeton]. It clearly is being denied effect in this case.

The plurality speculates that, had the claim against Aviation gone to the jury it might well have awarded McConal additional damages. However, there is no indication that the jury would have done so. McConal sued Commercial for the costs of repairing its airplane, transportation and

storage charges, and interest on a loan. The jury's verdict awarded McConal only slightly more than the requested damages. Although McConal refers in its brief to other amounts which it might have claimed from Aviation, we are pointed to nothing in the record indicating that McConal's loss was other than the single, indivisible, unitary loss which Commercial alleges it was.

Had the case gone to the jury against both defendants, the jury would have returned a verdict against one and exonerated the other. McConal concedes that the claims asserted against Commercial and Aviation—a claim for breach of a contract of insurance and a claim for negligent failure to procure insurance, respectively— were mutually exclusive. Since the case proceeded against only one defendant, *what is the justification for allowing the plaintiff to retain more than the amount of its damages?*

The policy against duplicate recovery, while no doubt strong and longstanding, does admit of exceptions. One of those exceptions—perhaps the most pervasive— is provided by the collateral source rule.[1] (I shall return below to consideration of the policy underlying that rule.) Since the policy has exceptions, one might wonder what the reason is for the policy itself. Is the law so niggardly in its conferral of benefits and recognition of rights that it simply cannot stand to see a claimant receive more than his or her out-of-pocket losses, no matter what the circumstances? Again, the collateral source rule stands as an obstacle to an across-the-board enforcement of any such penurious policy.

It is commonly assumed that the policy against duplicate recovery prevents unjust enrichment, *see, e.g.,* Prosser & Keeton at 330; but this only raises further questions: What is "enrichment," and when will it be deemed "unjust"?

Another relevant policy is the one relied on in the plurality opinion—the policy favoring settlements. The theory is that if the nonsettling defendant knows that its liability will be reduced because of the previous settlement, it will have no incentive to make a settlement itself; it will have every incentive to gamble on a favorable outcome at trial, and the policy favoring settlements will thereby be frustrated. Looked at from the standpoint of the nonsettling defendant, this theory probably makes sense. However, from the standpoint of the *claimant* the opposite is probably true. If the claimant knows that the previous settlement will be credited to any judgment against the nonsettling defendant, the claimant will have every reason to settle for as much as he or she can get; if, on the other hand, the settlement is not credited, the claimant will have every reason to "go for broke" and press the case to trial against at least one defendant. A victory at trial will mean no reduction, whereas a loss will leave the claimant at least partially compensated through the settlement(s) with the previous defendant(s).

I hesitate to endorse a result in this case that fuels the fire in lawsuits of this sort and encourages claimants to bring as many claims [2] as they can devise against as many defendants as they can find and then proceed to settle with each defendant in turn, making a settlement that, among other things, finances the litigation against the remaining defendant(s) and enables the claimant to gamble for the big stakes. However, I conclude that the answer to the question whether settlement is encouraged or discouraged by crediting the amount of the first settlement against any later judgment probably is neutral and really depends on the size of the settlement in rela-

---

1. It is widely believed that the collateral source rule has little or no application to contract claims. *See, e.g., Restatement (Second) of Contracts* § 347, comment e (1979); D. Dobbs, *Handbook on the Law of Remedies* § 8.10, at 587 (1973). For an exhaustive demonstration that this is not correct, *see generally* J.G. Fleming, *The Collateral Source Rule and Contract Damages,* 71 Calif.L.Rev. 56 (1983).

2. *E.g.,* a claim against one defendant for negligence, a claim against another for an intentional tort, a claim against another for breach of warranty (contract), and a claim against still another for strict liability.

tion to the nonsettling defendant's exposure and the claimant's potential recovery. If the previous settlement is relatively large, as in this case, then crediting it against an ultimate recovery diminishes the remaining defendant's incentive to settle and correspondingly increases the pressure on the claimant to compromise, rather than risk the cost of going to trial when the marginally greater recovery will be reduced if the claimant is successful. On the other hand, if the amount of the settlement is small in relation to the exposure and potential recovery, then crediting it does not materially lessen the claimant's risk in going to trial and provides the nonsettling defendant little incentive to reduce his own risk by making a settlement before trial.

Still another policy in the mix is that which underlies the collateral source rule: the policy that a wrongdoer should not benefit from a fund provided by a collateral source and that, as between an innocent plaintiff and a culpable defendant, if one party is to benefit from a fund received from another source, it is preferable to allocate the benefit to the innocent party. In this case, it is clear that McConal's loss will be compensated in full. The only question is whether the $40,000 paid by Aviation will augment McConal's recovery or will reduce Commercial's liability.

I answer this question by resorting to the policy of expecting (and therefore, in the context of this case, requiring) the insurance company and the agent-broker to get their act together. McConal bought and paid for property damage insurance. The insurance company denied liability, pointing the finger at the agent; the agent claimed that it was not responsible and that, at least by implication, it had not failed in its duty to procure insurance from the insurer. Meanwhile, the insured was not compensated for its loss and had to commence litigation. It had done everything required of it to see that its property was insured; the insurer and the agent between them evaded responsibility and

placed the onus of going forward on the insured. The insured had to undergo the delays, inconvenience, uncertainties and expense of litigation; the insurer and the agent between them could keep the insured's money until they either voluntarily settled or the court told one of them to pay.

Under these circumstances it does not seem unreasonable to require the insurer, Commercial, to pay what it contracted to pay and to allow the insured, McConal, to keep what the agent, Aviation, voluntarily contributed in order to settle its alleged liability.

> If there must be a windfall certainly it is more just that the injured person shall profit therefrom, rather than the wrongdoer shall be relieved of his full responsibility for his wrongdoing. We think we may judicially note that notwithstanding that the law contemplates full compensation, incidental losses and handicaps are suffered in a great number of * * * cases which are not, and cannot be, fully compensated.

*Grayson v. Williams*, 256 F.2d 61, 65 (10th Cir.1958). *See also Helfend v. Southern Cal. Rapid Transit Dist.*, 2 Cal.3d 1, 12, 84 Cal.Rptr. 173, 180, 465 P.2d 61, 68 (1970):

> [T]he plaintiff rarely actually receives full compensation for his injuries as computed by the jury. The collateral source rule partially serves to compensate for the attorney's share and does not actually render "double recovery" for the plaintiff.

The insurance company in this case, seeking a judicial determination as to the existence of coverage under its policy, might not fit the classical picture of the "wrongdoer" who is denied an offset of the benefit under the collateral source rule. However, Commercial and Aviation between them did force McConal to endure the "losses and handicaps" entailed by the delay in payment and the necessity for litigation. One of these losses—not insignificant in amount, I have no doubt—was the attorney's fees. Under the policy of

the collateral source rule—that the "windfall" is to be allocated to the innocent claimant rather than the arguably culpable defendant who a jury has determined breached its contract—I concur in giving the plaintiff the "duplicate recovery" realized in this case.