1999–NMCA–156

993 P.2d 112

BOARD OF EDUCATION FOR THE CARLSBAD MUNICIPAL SCHOOLS, Plaintiff–Appellant,

v.

NEW MEXICO STATE DEPARTMENT OF PUBLIC EDUCATION, the New Mexico State Board of Education, and Alan D. Morgan, as Superintendent of Public Instruction, Defendants–Appellees.

No. 19,434.

Court of Appeals of New Mexico.

Sept. 17, 1999.

Certiorari Denied, No. 26,042, Dec. 9, 1999.

Thomas L. Marek, Matthew T. Byers, Marek, Francis & Byers, P.A., Carlsbad, for Appellant.

Patricia A. Madrid, Attorney General, Elizabeth A. Glenn, Assistant Attorney General, Santa Fe, for Appellees.

## OPINION

ALARID, J.

{1} This appeal addresses, in part, the manner in which public school teachers are given credit for their training and experience, how salaries are set for public school teachers, and how much funding the State allocates for each school district annually. The Board of Education for Carlsbad Municipal Schools (Carlsbad) appeals the trial court's judgment in favor of the State Department of Education (the Department), the New Mexico State Board of Education (the State Board), and Alan D. Morgan, as Superintendent of Public Instruction (the State Superintendent) (collectively Defendants). Specifically, Carlsbad asserts that the trial court erred in (1) determining that Defendants acted within their legislative authority when construing NMSA 1978, Section 22–8–24 (1993), (2) allowing legislators to testify regarding legislative intent, and (3) deciding that Defendants are not equitably estopped from rescinding waivers they granted to Carlsbad. We disagree. We affirm the trial court's decision because the Defendants' construction of the statute is valid and Carlsbad abandoned any right to oppose enforcement of valid rules, regulations, and policies when it settled prior litigation with the State Board.

## FACTS

### Training and Experience Index

{2} In 1969, the State Legislature enacted the New Mexico State Equalization Guarantee Distribution. See NMSA 1978, § 22–8–25 (1990). The State Legislature enacted a formula under the statute to assure that each school district would receive an equitable amount of state education funds. Later, the State Legislature added to this formula by allowing teachers to receive credit for further education and experience. The instructional staff training and experience index (the training and experience index) defines this additional credit. See § 22–8–24(B). Section 22–8–24(B) provides:

The factors for each classification of academic training by years of experience are provided in the following table:

| Academic Classification | Years of Experience | | | | |
| --- | --- | --- | --- | --- | --- |
| | 0-2 | 3-5 | 6-8 | 9-15 | Over 15 |
| Bachelor's degree or less | .75 | .90 | 1.00 | 1.05 | 1.05 |
| Bachelor's degree plus 15 credit hours | .80 | .95 | 1.00 | 1.10 | 1.15 |
| Master's degree or bachelor's degree plus 45 credit hours | .85 | 1.00 | 1.05 | 1.15 | 1.20 |
| Master's degree plus 15 credit hours | .90 | 1.05 | 1.15 | 1.30 | 1.35 |
| Post-master's degree or master's degree plus 45 credit hours | 1.00 | 1.15 | 1.30 | 1.40 | 1.50 |

{3} The training and experience index provides a basis for funding given to each school district. Each teacher's number of years of experience and the level of each teacher's education determines, in part, the funding for each school district. The average of the total number of years of experience and academic classification of all teachers in a school district is the training and experience index number for that particular school district. See § 22–8–24(C). The Department uses the training and experience index number for each school district to determine the funding each school district will receive annually.

*Carlsbad's Interpretation of the Training and Experience Index*

{4} Carlsbad wanted to encourage additional education for teachers, provide higher salaries for teachers and provide more funding for its school district. Cecil Brininstool, the director of research and testing, interpreted the training and experience index as allowing teachers to carry over their additional credit hours (interim credit hours) upon earning a higher degree. For example, if a teacher had a training-and-experience-index classification of a bachelor's degree plus 45 credit hours and that teacher subsequently earned a master's degree, not using any of the interim credit hours toward the master's degree, the teacher would retain the interim credit hours. Thus, the teacher's training-and-experience-index classification would become a master's degree plus 45 credit hours. This new, higher classification would increase the funding the school district received each year and increase the teacher's salary.

{5} This interpretation of the training and experience index was incorporated into Carlsbad's salary schedule for 1990–91. In the spring of 1990, Carlsbad informed the Department's associate superintendent for school management, Stan Rounds, of its plan.

*The Manual and Waivers*

{6} In October 1990, pursuant to Section 22–8–24(C), the State Superintendent, with approval of the State Board, promulgated and published instructions for calculating the training and experience index (the manual). The manual prohibited school districts from interpreting the training and experience index in the manner that Carlsbad had proposed. Under the guidelines of the manual, teachers could not carry over their interim credit hours after earning a higher degree.

{7} As part of the manual, the State Superintendent implemented a waiver policy. The State Superintendent set up the waiver policy to reduce the financial impact of the training and experience schedule on those schools that had adopted an interpretation of the training and experience index different from the interpretation in the manual. Schools that were already using an alternative interpretation could continue to do so regarding those teachers that the school

district already employed. Newly hired teachers were those affected by the manual. According to the testimony of Assistant Superintendent Susan Brown of the Department, to qualify for the waiver, the school district had to show that "(1) the district had, in good faith, a policy that the district believed was in compliance with the [training and experience] statute, (2) the policy was in place before the manual was published, and (3) the policy was reasonable." Carlsbad applied for and obtained a waiver. Carlsbad promulgated a personnel policy that it would pay in accordance with its approach "as long as the credit is allowed by the State [training and experience] funding formula."

*Termination of Waivers*

{8} On November 30, and December 1, 1993, the State Board conducted its regular meeting. At this meeting the State Board considered recommendations by the training and experience task force and by the Department staff regarding the termination of waivers. The State Board decided that all of the waivers should expire by December 1, 1994. Later, the State Board extended the date of termination to December 1, 1995. The termination of waivers had a prospective effect in that the Department calculates the training and experience index for each school district for the next year based on the current year's October payroll. *See* § 22–8–25(D)(4). Therefore, the first school year to be affected by the termination of waivers was the 1997–98 school year when the October 1996 payroll was used to determine the training and experience index for the 1997–98 school year.

{9} In 1997, the State Legislature amended the school funding formula and passed the Education Appropriation Act. The State Legislature designed the Act to ensure that no school district received less funding than it had in the previous year. According to testimony by the Department's Associate Superintendent, Michael Davis, this was to ensure that schools did not lose funding because of the termination of the training and experience waivers.

*Settlement Agreement*

{10} On June 8, 1993, Carlsbad filed a petition for alternative writ of mandamus,

application for preliminary injunction, and complaint for declaratory judgment. The issue before the trial court was the calculation of Carlsbad's training and experience index. Carlsbad claimed that their index number at the time was 1.181. The Department of Education claimed Carlsbad's index was 1.164. The difference in the calculation of the index numbers was due to a discrepancy in the credit teachers received for military experience and in-service training.

{11} In November 1993, the parties entered a settlement agreement. The settlement agreement provided in part:

5. Notification by [the Department] regarding any changes or interpretation in how the [training and experience index] is calculated will be done in advance with sufficient time for such adjustments to be made before the calculation of the [training and experience index] in October for the subsequent year's budget submissions.

6. [Carlsbad] agrees to comply with all [of the Department] rules, regulations and policies regarding calculation of the [training and experience index] and [the Department] agrees that [Carlsbad] will be treated in an equitable manner.

As a result of this settlement agreement, the trial court dismissed the suit with prejudice.

*Procedural Facts*

{12} On December 23, 1994, Carlsbad filed suit in this case, seeking to enjoin the Department from terminating Carlsbad's waiver. The trial was conducted August 14–15, 1996. The trial court granted judgment to Carlsbad on its theory of equitable estoppel. On February 19, 1997, Defendants filed a motion to vacate and reconsider decision and judgment. The trial court granted Defendants' motion and vacated the injunction on the ground that the 1997 Education Appropriation Act provided Carlsbad with sufficient additional funding 'to hold harmless [Carlsbad] from the loss pursuant to the elimination of [training and experience] waivers.' Later, the court entered judgment for Defendants. On February 9, 1998, Carlsbad filed a motion for new trial that the trial court denied. Subsequently, Carlsbad filed its appeal.

*DISCUSSION*

*Enforcement of the Settlement Agreement*

{13} The Department asserts that Carlsbad's filing of this complaint violates the 1993 settlement agreement between Carlsbad and Defendants. We agree that the settlement agreement binds Carlsbad and that it has violated the agreement by filing its complaint.

{14} Although Carlsbad asserts that the issue involved in the settlement agreement is different from that before us, Carlsbad's agreement to comply with all Department rules, regulations, and policies regarding the training and experience index is unqualified. Termination of all waivers was a policy encompassed by the agreement. *See Burden v. Colonial Homes, Inc.,* 79 N.M. 170, 173, 441 P.2d 210, 213 (1968) ("We are bound by the unambiguous language of the settlement agreement[ ]."). Additionally, public policy encourages, and we have a duty to enforce, settlement agreements. *See Gonzales v. Atnip,* 102 N.M. 194, 195, 692 P.2d 1343, 1344 (Ct.App.1984); *see also De Cespedes v. Bolanos,* 711 So.2d 216, 218 (Fla. Dist.Ct.App.1998); *M.H. Detrick Co. v. Century Indem. Co.,* 299 Ill.App.3d 620, 233 Ill. Dec. 513, 701 N.E.2d 156, 159 (1998); *Calavano v. New York City Health & Hosp. Corp.,* 246 A.D.2d 317, 667 N.Y.S.2d 351, 353 (1998).

*Validity of the Manual*

{15} We assume that Carlsbad and the Department intended that section six of the settlement agreement apply to properly instituted "Department of Education rules, regulations and policies regarding calculation of the [training and experience] Index." We, therefore, must address the rules provided by the manual and the Superintendent's interpretation of Section 22–8–24(B).

{16} Interpretation of a statute is a question of law that we review de novo. *See State v. Paul P. Jr.,* 1999–NMCA–077, ¶ 7, 127 N.M. 492, 983 P.2d 1011; *Kahrs v. Sanchez,* 1998–NMCA–037, ¶ 11, 125 N.M. 1, 956 P.2d 132. "The primary purpose of statutory interpretation is to ascertain and give

effect to legislative intent." *Kahrs*, 1998–NMCA–037, ¶ 11, 125 N.M. 1, 956 P.2d 132.

{17} When interpreting a statute, we must "construe the entire statute as a whole so that all the provisions will be considered in relation to one another." *Regents of the Univ. of N.M. v. N.M. Fed'n of Teachers*, 1998–NMSC–020, ¶ 28, 125 N.M. 401, 962 P.2d 1236. Beyond the language of subsection B that provides the training and experience index, the language of subsection C is central to our discussion. Subsection C provides in part: "The . . . training and experience index for each school district shall be calculated in accordance with instructions issued by the state superintendent." Section 22–8–24(C). This subsection gives the superintendent the authority to dictate how he or she will interpret and apply the training and experience index. Therefore, we must examine how the Superintendent interpreted the training and experience index.

{18} The Superintendent interpreted the language of Section 22–8–24(B) as allowing interim credit hours before a teacher earns a new degree but disallowing credit for those hours once the teacher earns the degree. In analyzing this interpretation of the statute, our initial inquiry is whether this statute is ambiguous. *See Kahrs*, 1998 NMCA–037, ¶ 11, 125 N.M. 1, 956 P.2d 132. The language of Section 22–8–24(B) is ambiguous. A statute is ambiguous if reasonably informed persons can understand the statute as having two or more meanings. *See Styka v. Styka*, 1999–NMCA–002, ¶ 21, 126 N.M. 515, 972 P.2d 16; *Alverson v. Harris*, 1997–NMCA–024, ¶ 8, 123 N.M. 153, 935 P.2d 1165. Here Carlsbad interprets subsection B as allowing teachers to carry over their interim credit hours after earning a higher degree. Defendants interpret subsection B so that the interim credit hours are lost once the higher degree is conferred. Both interpretations are reasonable. Because Section 22–8–24(B) is subject to more than one reasonable meaning, we hold that it is ambiguous.

{19} When an ambiguity such as this exists, the agency charged with effectuating the statute has authority to interpret it.

*See Rex, Inc. v. Manufactured Housing Comm.*, 119 N.M. 500, 512, 892 P.2d 947, 959 (1995). We may "accord substantial weight to the interpretation given a statute" by the agency charged with administering the statute. *See id.* Not only will we confer a greater weight to an agency's interpretation, but we will give a heightened degree of deference to an agency's interpretation if the statute implicates special agency expertise or reference to an agency's policies. *See Morningstar Water Users Ass'n v. New Mexico Pub. Util. Comm'n*, 120 N.M. 579, 583, 904 P.2d 28, 32 (1995).

{20} The Superintendent is charged with the job of interpreting the statute, *see* § 22–8–24(C) and directing the operation of the Department, *see* NMSA 1978, § 22–2–5 (1967). The interpretation of the statute requires the Superintendent's expertise and knowledge of the Department's policies. We therefore will accord substantial weight and deference to the Superintendent's interpretation of the training and experience index.

## CONCLUSION

{21} The manual written by the Superintendent creates valid "rules, regulations and policies regarding the calculation of the [training and experience index.]" We hold that the instructions the Superintendent issued in the manual are binding on Carlsbad and we enforce the terms of the settlement agreement entered by Carlsbad and Defendants. We affirm the trial court's judgment in favor of Defendants.

{22} IT IS SO ORDERED.

APODACA and HARTZ, JJ., concur.